UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:17-CR-02558-MV |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| ARTHUR PERRAULT, | ) | Tuesday, September 25, 2018 |
| | ) | |
| Defendant. | ) | (11:47 a.m. to 12:24 p.m.) |

DETENTION HEARING

BEFORE THE HONORABLE KAREN B. MOLZEN,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            HOLLAND KASTRIN, ESQ.
                         SEAN SULLIVAN, ESQ.
                         U.S. Attorney's Office
                         District of New Mexico
                         P.O. Box 607
                         Albuquerque, NM 87103

For Defendant:           SAMUEL L. WINDER, ESQ.
                         Romero & Winder
                         1905 Lomas Blvd. NW
                         Albuquerque, NM 87104

U.S. Pretrial/Probation: D. Marrufo-Ramos / C. Duarte

Court Reporter:          Recorded; LIBERTY-RIO GRANDE

Clerk:                   E. Romero

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1       **Albuquerque, NM; Tuesday, September 25, 2018; 11:47 a.m.**

2                            **(Call to Order)**

3              **THE COURT:**  For Detention Hearing, *United States of*

4       *America versus Arthur Perrault* in 17-CR-2558-MV.

5              **MR. SULLIVAN:**  Good morning, Your Honor.  Sean

6       Sullivan and Holland Kastrin for the United States.

7              **THE COURT:**  Thank you.

8              **MR. WINDER:**  Good morning, Your Honor.  Samuel Winder

9       on behalf of Mr. Arthur Perrault who is present.

10             **THE COURT:**  All right.  And we are here for a

11      Detention Hearing this morning.  Are we going to be taking

12      evidence in this matter or proffer?  How are we going to

13      proceed?

14             **MR. SULLIVAN:**  Your Honor, the United States is

15      prepared to proceed by proffer.

16             **THE COURT:**  All right.  Will that work for you,

17      Mr. Winder?

18             **THE DEFENDANT:**  I'm having trouble hearing you.

19             **THE COURT:**  I was hoping that we would be able to use

20      -- do you have your hearing aid in today?  Yeah.  I was hoping

21      -- we have these headsets.

22             **THE DEFENDANT:**  No, I can hear you now.

23             **THE COURT:**  Oh, you can?

24             **THE DEFENDANT:**  Yes.  Yes.  Fine.

25             **THE COURT:**  Okay.  Well, if at any time you cannot

1   hear me or hear Mr. Sullivan or Ms. Kastrin or Mr. Winder, you

2   let me know.  Will you do that?

3         **THE DEFENDANT:**  Certainly.

4         **THE COURT:**  All right.  Any objection to proceeding

5   by proffer?

6         **MR. WINDER:**  No, Your Honor.  No objection.

7         **THE COURT:**  All right.  Mr. Sullivan?

8         **MR. SULLIVAN:**  Yes, Your Honor.  Our position is that

9   the Defendant is a very serious flight risk or risk of

10  nonappearance and a danger to the community, and those risks

11  can't be mitigated by any conditions of pretrial release, no

12  matter how serious that they are.

13        As we played out for you in our written motion to

14  detain, the Defendant, over the course of more than 20 years,

15  abused numerous children in the State of New Mexico and even

16  before that --

17        **THE COURT:**  Let me make sure -- can you hear

18  everything, Mr. Perrault?

19        **THE DEFENDANT:**  Yes.  Yes.

20        **THE COURT:**  Okay.

21        **MR. SULLIVAN:**  -- as a Catholic priest.  Then when

22  the allegations became public for the first time in 1992, he

23  fled to Morocco where he remained until just last week when the

24  United States asked for an extradition-like proceeding.  We

25  don't have an Extradition Treaty with Morocco, but we follow a

4

1    similar procedure.  The country expelled him from their country

2    and the FBI picked him up and brought him back here.

3              So I'd like to address a few things in support of

4    detaining him here, understanding that Mr. Winder is going to

5    make his arguments on Mr. Perrault's behalf and also that

6    Pretrial Services in this case has recommended his release to

7    the halfway house with certain conditions.

8              **THE COURT:**  Well, let me interject something.

9              **MR. SULLIVAN:**  Yes.

10             **THE COURT:**  Pretrial Services -- and, Mr. Winder,

11   you've reviewed this Pretrial Services report with

12   Mr. Perrault?

13             **MR. WINDER:**  Yes, Your Honor.

14             **THE COURT:**  Pretrial Services is not permitted to

15   look at a couple of things that I'm required to look at.  One

16   of them is the weight of the evidence.  The other is a

17   rebuttable presumption that Congress has created.

18             So, Mr. Perrault, based upon these charges, there is

19   -- Congress created a presumption that there are no conditions

20   for release that would be appropriate.  Now, that's rebuttable

21   presumption, but I wanted to explain that that's something that

22   Pretrial Services cannot take into account when it's making its

23   recommendation.  And I just wanted to make you aware of that.

24   Okay?

25             Go on ahead, Mr. Sullivan.

1          **MR. SULLIVAN:**  Yes, Your Honor.  I'm glad that we

2    brought that up.  A lot of what I'm going to say, and I won't

3    be very long, is going to focus on some of those things like

4    the weight of the evidence and the presumption that applies

5    here.

6          As for the Defendant being a flight risk, Pretrial

7    Services properly found that he is a flight risk and you should

8    find that, too.  Although they say there are conditions that

9    would mitigate the flight, we submit to you that there are not.

10   First of all, the Defendant fled from the United States when he

11   was facing allegations of abusing children as a Catholic

12   priest.

13         **THE COURT:**  And let me hold on for a moment.  For the

14   record, we've put on a headset that, hopefully, is amplifying

15   the sound.  Does that make it easier for you to hear,

16   Mr. Perrault?

17         **THE DEFENDANT:**  Perhaps.

18         **THE COURT:**  Okay.  If it doesn't, let me know.  Go on

19   ahead, Mr. Sullivan.

20         **MR. SULLIVAN:**  Your Honor, first, the Defendant went

21   to Canada, but he didn't stay there.  He then moved on to

22   Morocco.  He told Pretrial Services that the reason why he did

23   that is because the cost of living was less in Morocco.  Well,

24   the cost of living is less in a lot of countries, including our

25   neighbor Mexico, for the most part.  But Morocco is a very

1    advantageous place for someone like him to flee because it

2    doesn't have an Extradition Treaty with the United States.

3            And I don't want to go into all of the mechanisms we

4    had to do to get him back, but it's more difficult to get

5    someone back from a country where we don't have an Extradition

6    Treaty.  And even though we can do it, in the eyes or the mind

7    of most people who flee, you can see why they would end up in a

8    place that does not have an Extradition Treaty.

9            The Defendant lived there for about 23 years.  He

10   knew of the civil allegations at that time, including just a

11   couple of years ago he was directly advised that -- of a

12   default judgment or at least a pending proceeding against him

13   in the District Court here in New Mexico, the State District

14   Court.  And rather than submit to that jurisdiction, he just

15   wrote a letter to Judge Denise Barela-Shepherd acknowledging

16   his awareness of the case, but he didn't surrender.  He offered

17   some excuses and some reasons for why he wasn't answerable to

18   those charges, but he was aware and he didn't come back

19   voluntarily.  He only came back in this case because the FBI

20   went and got him after he was expelled from the country.

21           On the flight back, the Defendant did have a

22   conversation after being advised of his *Miranda* Rights and

23   without asking for a lawyer, where he said, among other things,

24   that he maintains an apartment in Morocco and he's asked a

25   friend to look after that in contemplation of a possible return

1   in the future.

2          I'll also point out that when faced with the news

3   that the United States was seeking him to come back, he fought

4   that process and through the legal system of Morocco; he didn't

5   voluntarily come back.

6          Also, I'll point out that during the plane ride back

7   with the FBI Agents, the Defendant denied committing any acts

8   of child sexual abuse on Kirtland Air Force Base; however, in

9   general terms he did admit to touching children through their

10  clothing, engaging in oral sex and other things like that.

11         So, moving along, the Defendant also said that he has

12  one friend here in New Mexico.  That's not a lot of community

13  support.  We know who that person is.  He's mentioned him by

14  name and the FBI's already interviewed him.  He said he had no

15  family anywhere, much less in New Mexico or in the United

16  States.

17         And in terms of his flight risk, I think it's also

18  important to consider the nature of the crimes here and how

19  they involve manipulation and gaining someone's trust and then

20  exploiting that kind of trust.  And there's a variety of

21  different opportunities for someone to do that if they're at

22  liberty in order to get to the place they want to go, whether

23  it's a safe place abroad or even in the United States because

24  not only are you considering whether he's a flight risk,

25  meaning he'd leave the jurisdiction, but also just his risk of

1    nonappearance and he could do that tucked away somewhere within

2    New Mexico as well.  He's someone who's known to manipulate and

3    take advantage of people.

4            And also as to terms of flight risk, we can't just

5    assess Mr. Perrault and his age and his physical strength, but

6    what could he do to flee and to nonappear with the help of

7    others, which he could gain on the outside?  He's a risk of

8    nonappearance locally as well as a risk of flight out of the

9    jurisdiction.  So, for all of those reasons, he's a flight risk

10   that can't be mitigated.

11           As far as dangerousness --

12           **THE COURT:**  Let me back you up for a second.

13           **MR. SULLIVAN:**  Yes.

14           **THE COURT:**  You said that he could get help from

15   others as far as risk of flight.

16           **MR. SULLIVAN:**  Yes.

17           **THE COURT:**  You indicated to me he only has one

18   friend in this District.

19           **MR. SULLIVAN:**  He does at this time but, Your Honor,

20   if he were to be placed in a halfway house setting or something

21   like that, you know, somebody with his history of manipulating

22   people and earning their trust, perhaps he could do that with

23   fellow residents and then get them to assist him, people who

24   have privileges to go off the halfway house during the day for

25   work or school, or maybe family members.

1          While he has no one here, I think that speaks to his

2     community ties in light -- but I think he could, in the right

3     setting, try to curry favor with people who could help him in

4     an escape.

5          **THE COURT:**  Okay.

6          **MR. SULLIVAN:**  As far as his dangerousness, Pretrial

7     Services also found that he was dangerous to the community.

8     Although they suggest how that could be mitigated, we say that

9     it cannot be mitigated.  For one thing, as you've mentioned,

10    the presumption of detention applies in this case to six of the

11    seven charges.  But actually for all of the charges, they're

12    considered crimes of violence.  So even the one where the

13    presumption of detention doesn't apply under 18 U.S.C. 3156,

14    you are allowed to consider and should consider, in assessing

15    whether he should be detained, that all of the crimes are

16    crimes of violence.

17          They didn't require physical force like other crimes

18    of violence, or physical strength, but they're considered

19    crimes of violence nonetheless.

20          The Defendant is more dangerous now, we submit, than

21    he was in 1992 when the last of these crimes occurred because

22    we're now living in the Internet age and that gives someone

23    access fairly easily to pornography and to child pornography.

24          At a halfway house, according to the proposed

25    restrictions from Pretrial Services, they wouldn't include

1   forbidding him to have a cellphone and even if they did, they

2   wouldn't prevent other residents from having a cellphone.  And

3   that would allow him to get into cyberspace where he could do

4   harm similar to the harm he's done in the past; potentially

5   solicit a minor or something to that effect.

6         We should also in terms of dangerousness look back at

7   his life and -- and the Defendant in the late '60s was sent to

8   the Servants of the Paraclete in Jemez by another diocese in

9   America to be treated for instances of abusing children.  They

10   found him after a certain period of time, not a long period of

11   time, to be cured or to be rehabilitated and asked him what he

12   wanted to do, and he said he wanted to go to Saint Pius High

13   School where he worked with children.

14         We have credible allegations in this case, credible

15   evidence that he abused children at Saint Pius, though so long

16   ago that the statute of limitations has lapsed.  But then, this

17   pattern is followed when he goes to Morocco.

18         In fact, in his letter that he sent to Judge Barela-

19   Shepherd here in New Mexico, he said he was working at a school

20   in Morocco.  So given the opportunity, again, he went back to

21   work with children.

22         Now, we haven't been able to do enough investigation

23   on the ground in Morocco to see if there are any allegations

24   against him there or if anyone has come forward.  We need to

25   follow up with that.  Keeping in mind that it's a different

1  culture and the way they look at things like child sex abuse

2  and, I'm sure, they find it as abhorrent as we do, but it's a

3  different culture and we have to approach an investigation like

4  that with those sensitivities.

5          THE COURT:  Did I understand you to say there's no --

6  nothing that you're aware of as far as any similar charges in

7  Morocco?

8          MR. SULLIVAN:  That's right.  So I don't think we can

9  say that you should look less favorably on him because of

10  something that happened in Morocco; we have no such evidence.

11  But you also shouldn't look more favorably because we haven't

12  had an opportunity to investigate it, and especially if he's

13  working in a school and working with children, we know

14  historically that sometimes those things -- people don't come

15  forward and they come forward much later.  So I think that's

16  really a neutral factor in this case, but certainly not in his

17  favor.

18          THE COURT:  Wasn't his degree in -- his degree is in

19  education and that he had been an educator throughout his time

20  here in New Mexico, as well?

21          MR. SULLIVAN:  He did that part of the time.  Yes,

22  Your Honor, and he also worked as a parish priest.

23          THE COURT:  Okay.

24          MR. SULLIVAN:  But if -- kind of the same thing here,

25  it took more than 20 years for people to come forward and

1    accuse Father Perrault of abuse.  Maybe the same thing would

2    happen there.  I don't think we should look at that either way.

3              THE COURT:  And on another note, did the alleged

4    victim receive notice of today's hearing?

5              MR. SULLIVAN:  He did.  Yes.

6              THE COURT:  All right.

7              MR. SULLIVAN:  As well as many other people who --

8    whose abuse isn't charged in the indictment, and they've also

9    joined us here today.

10             We have evidence against dozens of victims actually

11   and, honestly, a jail setting is the best place for the

12   Defendant to be.  One, because it's a secure facility, there

13   are people there that are trained in law enforcement and being

14   armed, they can protect other people from Perrault, the

15   Defendant, as well as they can protect him from others.  We

16   know in a situation like this, with crimes of this nature, that

17   the security of the person who is in the facility is also very

18   important and they have the expertise and the security in order

19   to do that.

20             Also, the jail can meet his medical needs.  Since

21   back before the FBI went to pick up Perrault in Morocco, we

22   have been coordinating with doctors over there to make sure

23   that we had medicines and an accurate assessment of his health,

24   and that process is already started with the U.S. Marshals

25   Service going -- and the FBI, and FBI doctors, going back to

1    last week, and the best way for the continuity of care to

2    continue is in a jail setting where his needs can be met,

3    rather than outsourcing that to other people in the community.

4    That's not appropriate here.

5          So, based on all of those reasons, he's a serious

6    flight risk, a serious danger to the community, and none of

7    that can be mitigated.

8          And as I close, one more thing, Your Honor.  There is

9    a case in the Tenth Circuit that's very closely on point and

10   it's called United States v. Frater (phonetic), and I brought

11   copies of the Tenth Circuit opinion which I'll furnish to

12   Mr. Winder and also hand up to you.

13          **THE COURT:**  Thank you.

14          **MR. SULLIVAN:**  And you'll see in that case the Tenth

15   Circuit sound -- found that the District Court properly

16   remanded the Defendant pending trial.

17          That was a case where it was a drug crime.  The

18   Defendant fled first to Spain and then Cuba, and then United

19   Arab Emirates and, finally, he was tracked down at London

20   Heathrow Airport, but his crimes were drug crimes where a

21   presumption of detention applied, and he was extradited back to

22   the United States.  The Court specifically noted a few things,

23   like his lack of ties to the United States, his history of

24   international travel, and his residence abroad as reasons why

25   the District Court properly detained him.  All of those things

14

1   apply here.

2           This is a presumption case, presumption of detention.

3   It involves an extradition and the same things apply to the

4   Defendant in terms of his lack of ties to the United States,

5   his travel abroad and --

6           **THE COURT:**  You indicated --

7           **MR. SULLIVAN:**  -- his residence abroad.

8           **THE COURT:**  -- that -- I think you indicated that

9   Morocco had expelled him?

10          **MR. SULLIVAN:**  That's right.

11          **THE COURT:**  So there's no indication that Morocco

12  would accept him back even if he tried to go there with --

13          **MR. SULLIVAN:**  I think that's correct.  I mean, if he

14  tried to do a border crossing into Morocco, he would be

15  disallowed into Morocco.  That doesn't mean that there aren't

16  other countries that he could go to that offer similarly

17  favorable conditions.

18          **THE COURT:**  But now have -- I think it's also my

19  understanding that his passport was confiscated when he was

20  brought back to the United States?

21          **MR. SULLIVAN:**  That's correct.  And he does not have

22  the passport which might make entry difficult in some

23  countries, but we also have people who flee particularly to

24  Mexico and they're able to get access to that country without a

25  passport.  So the risks of him fleeing the United States still

1    exist.

2          Also, just in his head, while he's been expelled from

3    Morocco to face these charges, what we know from what he told

4    the Agents on the plane is he does maintain a residence over

5    there and he's asked somebody to look after it.  So, from his

6    frame of mind, it seems that he's at least contemplating

7    possibly being able to get away from these charges here and

8    return there in the future.

9          **THE COURT:**  All right.  Thank you, Mr. Sullivan.

10   Mr. Winder?

11         **MR. WINDER:**  May it please the Court.

12         Your Honor, before I go any further, and I will make

13   reference to it again, is that I ask Your Honor to take

14   judicial notice of the Pretrial Service's report, and I don't

15   have to go as far as Kansas to bring an issue that's close to

16   this District.  And I gave Mr. Sullivan and Ms. Kastrin an

17   indictment and the Clerk Minutes and an order allowing a -- one

18   of my former clients, go at least to the halfway house.  And

19   they are very serious charges.

20         My client -- I won't mention his name; he was about

21   72-years-old, he was charged with a minimum-mandatory 30 years

22   for allegedly sexually abusing his granddaughter.  He had

23   severe health issues and Your Honor released him to the custody

24   of a halfway house, notwithstanding whatever presumption there

25   might be in law.  So, there is precedence, Your Honor.

1          I've not received any discovery in this case.  The

2    only discovery that I've received is a two-page letter, which

3    -- actually, it was maybe three or four pages that my client

4    has sent to Judge Denise Barela-Shepherd.  I'm not aware of --

5    I've not received any -- I know at some point I will get the

6    discovery with regard to any statements that my client made,

7    but I have not received anything with regard -- any statements

8    with regard to what he might have said on the flight back to

9    the United States.

10          With reference to flight risk, my client, he's

11   82-years-old; he has no money.  I am not sure exactly how he

12   would make his way back to Morocco or to Mexico.

13          As everyone is aware, this is a case which has been

14   in the media and it would be very difficult for my client to

15   flee this jurisdiction.  He doesn't have a passport.  He's

16   relinquished his passport.  And with regard to the halfway

17   house, I don't know if Mr. Sullivan has ever gone to a halfway

18   house.  I've been to halfway house hundreds of times and I am

19   aware of the protocols that are in place at the halfway house

20   with regard to the residents that are there.  There are strict

21   conditions which Mr. Perrault would have to comply with, if

22   Your Honor follows the recommendation of Pretrial Services.

23   And I provided those to him and he's aware that if there should

24   be any violation whatsoever of any condition, that he would be

25   remanded to the custody of the U.S. Marshal.

1          Now, Mr. Sullivan has indicated that he believes that

2   the best place for Mr. Perrault to be is in jail.  Yet, I don't

3   know if Mr. Sullivan has ever gone to the Sandoval County

4   Detention Center or any other facilities in this District.

5   They're not very safe facilities.  There are fights that occur

6   all the time.  There are individuals that know people's cases

7   and there are fights.  It's not beyond the realm of

8   possibilities for an inmate, they watch the news, to learn who

9   Mr. Perrault is, and there are probably some severe

10  consequences that could flow from that.  So, I respectfully

11  disagree with Mr. Sullivan that the best place for Mr. Perrault

12  to be is in jail.

13         He has severe health issues.  He had a stroke several

14  years ago, and if Your Honor is inclined to release him or to

15  remand him back to custody of the U.S. Marshal, at some point,

16  I'll be approaching the AUSA with regards to Sandoval County.

17  That is not a very good place for medical care.  The place that

18  would be proper is probably the Cibola Correctional Center.

19  They have better healthcare facilities there than they do in

20  Sandoval County -- and if the -- so --

21         **THE COURT:**  That's an issue that is best raised with

22  the Marshal.

23         **MR. WINDER:**  I'll raise it with the U.S. Marshal at

24  some point, Your Honor.  Thank you, Your Honor.

25         Now, with regard to getting back to whether he is a

1  flight risk, he understands the severe consequences that would

2  flow from going to Morocco.  He doesn't have -- with regard to

3  this issue of getting help from others, he doesn't have any

4  family.  He doesn't have any relatives in the State of Mexico

5  or, frankly, in this country.  So, I find it very difficult to

6  see how Mr. Perrault would leave.  He's not using a cane today,

7  but he uses a cane.  His eyesight is not the greatest.  He

8  can't hear very well.  He has severe health issues.

9          I won't outline all the issues in the Pretrial

10  Service's report that outlines his health conditions.  He needs

11  his medication.  He needs blood thinner medication.  And so, he

12  would be putting his health at severe risk if, hypothetically

13  speaking, he would make his way to Mexico or to Canada.

14          Your Honor, with regard to the issue of danger to the

15  community, I'll go back to what I had mentioned earlier.  There

16  is precedence for Your Honor releasing individuals that are

17  charged with crimes like this to be released to the custody of

18  the halfway house.

19          And I know, obviously, there's an indictment that's

20  been placed against my client.  And, again, I don't have the

21  discovery in this case.  I'll get them in a couple of weeks --

22  get the discovery.  But to my knowledge, all the claims that

23  Mr. Sullivan has raised are civil claims.  I have not seen any

24  criminal claims that have been raised with regard to any of the

25  other alleged victims.  So, for him to point to the other

1  claims, they're civil; they're not criminal in nature.

2         So, I believe that his arguments with regard to him

3  being a danger to the community, looking at those other crimes,

4  is inappropriate.

5         Your Honor, with regard to the matter again with the

6  issues involving statements that he made, I've not received any

7  copies of the statements he made.  I have no discovery, but I

8  will point out for the record that it was my understanding that

9  Mr. Sullivan was considering presenting this letter as evidence

10  to the Court.

11         But I'll proffer to the Court what's set forth in

12  this letter is that he taught 1,800 youngsters for 23 years.

13  There was a -- somewhat of an investigation that flowed and

14  there was no allegations or rumors against him doing anything

15  to those children over -- any of those children that he taught

16  for 23 years.  And Mr. Sullivan --

17         **THE COURT:**  And you're referring to his --

18         **MR. WINDER:**  -- a letter to --

19         **THE COURT:**  -- letter to Judge Barela-Shepherd.

20         **MR. WINDER:**  Barela-Shepherd, yes, Your Honor.  And

21  so, Mr. Sullivan indicates that they will conduct their

22  investigation in Morocco; I may need to do the same thing as

23  well, but at least the letter that they presented to me

24  indicates that there is nothing that was reported over a

25  23-year-period teaching 1,800 youngsters, Your Honor.

1          So, Your Honor, I believe that there are reasonable

2    conditions that could be fashioned to protect the community.

3    With regard to the allegation in this case, it's my

4    understanding that there was a source in 2016 that presented

5    this to the U.S. Attorney's Office or to the FBI.

6          My experience as a Federal Prosecutor and a Defense

7    Attorney, normally in cases, if there is a crime that occurs,

8    it's immediately reported to the FBI or to the District

9    Attorney's Office.  That didn't happen in this case.  It took

10   almost 30 years after a civil lawsuit has been filed for this

11   issue to be brought to the attention of law enforcement.

12         The case that I had mentioned before involving a

13   former client, the alleged victim was 11-years-old.  It's my

14   understanding that the alleged victim in this case is an adult.

15         My client would be at the halfway house.  He'll be on

16   GPS monitoring.  If he should leave the facility for other than

17   healthcare -- he can't work, that's one of the issues that --

18   he's not able to work.  But he -- I'm confident that Pretrial

19   Services would contact me, and I would address the situation.

20   I spend a lot of times with my clients and with this -- with

21   Mr. Perrault, I will go to La Posada once a week to make sure

22   that things are going well, that he's having -- that his health

23   concerns are addressed and, sadly, for many of my clients, we

24   can't see them once a week.  We see them two or three times a

25   -- maybe once a month.  But it's difficult for us to keep in

1   contact with our clients with regard to their health needs.

2   And I believe that I would be able to have more of a chance to

3   make sure everything is appropriate if Mr. Perrault is at the

4   halfway house.

5           So, again, Your Honor, I respectfully ask that you

6   take judicial notice of the Pretrial Service's report and there

7   are strict conditions that are in place.  My former client

8   never violated any conditions when he was -- when he pled

9   guilty, he was remanded to the custody of the U.S. Marshals and

10  his healthcare needs were taken care of.  But I can tell you in

11  the case I've made reference to, there were concerns I had

12  often when I visited with him at the Santa Fe Adult Detention

13  Center with regard to his healthcare needs.  And those are the

14  concerns I have, Your Honor.

15          And so, I would ask that you accept the

16  recommendations of Pretrial Services in this matter and release

17  Mr. Perrault to the third-party custody of La Posada Halfway

18  House with the strict conditions that are set forth in the

19  Pretrial Service's report including the GPS monitoring, the

20  home incarceration component.  Thank you, Your Honor.

21          **THE COURT:**  Thank you.  Your response, sir?

22          **MR. SULLIVAN:**  Yes, Your Honor.  First of all, it's

23  widely known that allegations of child sexual abuse often would

24  come years after the fact.  Children are vulnerable.  They can

25  be manipulated and scared into keeping quiet.  This case is no

1    different.

2         As far as the case that Mr. Winder is talking about,

3    the Defendant's name is "Pete" and he talks about that

4    supporting his argument for why the Defendant should be

5    released.  That case has nothing in common with this case.  The

6    Defendant in that case was an Indian who lived on the Indian

7    place in New Mexico.  I mean --

8         **THE COURT:**  If I recall, there was significant family

9    ties.

10        **MR. SULLIVAN:**  -- as there would be in a tribal

11   community.  That's the opposite of someone who's been living

12   abroad for more than 20 years and is originally from the east

13   coast of the United States.

14        I'll also point out that we have some cases we can

15   furnish for the Court, including one of them being United

16   States vs. Bonilla (phonetic), which is an opinion from the

17   Second Circuit 388 F. App'x 78, from the Second Circuit in

18   2010.  It says that the fact Defendants have involuntarily

19   forfeited their passports does not serve to eviscerate the risk

20   of flight.  And *Bonilla* cites to some other cases for that

21   proposition.

22        The evidence here is insufficient to overcome the

23   presumption of detention.  As far as health issues, the

24   Defendant has been in the custody of Moroccan law enforcement

25   for a year and they've been able to adequately address his

1    health issues and concerns.  Many people who are sick and

2    elderly and have infirmities and conditions close to what the

3    Defendant have are managed by the Marshal Service and managed

4    by the Bureau of Prisons.

5           And one last thing on the issue of GPS monitoring at

6    the halfway house, there's an opinion that we cite in our

7    motion to detain coming from Judge Browning that recognizes

8    that because of our close proximity to the Mexican border, even

9    when someone is in the halfway house with GPS monitoring, still

10   because they're so close to Mexico, they still pose a flight

11   risk and that doesn't entirely mitigate it.

12          So, for all of those reasons, it's the Defendant's

13   burden to rebut the presumption that applies here.  He hasn't

14   put forth enough evidence to overcome it --

15          **THE COURT:**  Well, you bear -- the Government bears

16   the ultimate burden of proof even when we have that presumption

17   there.

18          **MR. SULLIVAN:**  That's right.

19          **THE COURT:**  And as far as flight risk, it's by a

20   preponderance of the evidence.  When you talked about

21   Mr. Perrault relocating to Morocco in 1992, were there any

22   allegations at that time?

23          **MR. SULLIVAN:**  There were, Your Honor.

24          **THE COURT:**  And could you explain that more for me

25   because it seems to me that figures into your analysis with

1  regard that your allegation that he left in order to avoid any

2  kind of consequences.

3          **MR. SULLIVAN:**  That's right.  Some of them were

4  reported in the news.  News reporters were going to

5  Saint Bernadette's where he was the Pastor and asking about him

6  and asking if he had been involved in abusing children, as well

7  as lawsuits being filed at that time against him and against

8  the Archdiocese.  And so, it was public at that time.

9          **THE COURT:**  Okay.

10          **MR. SULLIVAN:**  That's what prompted him to leave.

11  And then, very quickly, after that, the Archbishop, learning of

12  these allegations, suspended his faculties to be a priest

13  within the Archdiocese and ordered him to continue to be

14  observant, but to do that privately and not to interact with

15  any parishioners.

16          **THE COURT:**  Okay.  Thank you, sir.

17          **MR. WINDER:**  May I respond briefly, Your Honor?

18          **THE COURT:**  You may.

19          **MR. WINDER:**  Your Honor, thank you.  Mr. Perrault

20  informed me that he was at the infirmary all the time that he

21  was in custody in Morocco.  And I know the case *Benson Pete*

22  (phonetic) very well, and for the record, he did not have

23  family ties in New Mexico.  His family lived in the State of

24  Arizona on the reservation, which is about five or six hours

25  from Albuquerque.

1          With regard to, again, I'm not hanging -- my

2   arguments do not hang upon the case that I made reference to.

3   What I was merely trying to show is there has been at least,

4   and I'm sure there's been other instances where individuals

5   that are accused of drug crimes, violent crimes, have been

6   released to the custody of the halfway house.  I was merely

7   presenting one that I actually handled that was similar in

8   nature with regards -- because of the age and the health issues

9   with regard to my client -- former client.  And in that case,

10  there was a individual that was young that -- and it was a case

11  that was reported soon thereafter after the incident allegedly

12  occurred.

13         In this case, Your Honor, this is a case that's 30

14  years old and, obviously, we're not certain as to where this

15  matter will proceed but, ultimately, this case is going to be a

16  matter of what the victim says and what Mr. Perrault says.

17  There's no corroborating evidence that I'm aware of with regard

18  to the allegations set forth in the indictment.  At some point

19  I believe I'll get some, but right now, I don't have any of the

20  corroborating evidence with regard to any of the matters.

21  Thank you, Your Honor.

22         **THE COURT:**  All right.

23         One of the biggest concerns for me was that he left

24  when these allegations were first made.  And as far as an

25  indication of a risk of flight, the actual evasion or leaving

1    to me is a very strong indication of that factor.  Especially

2    given now with the probable cause determination finding by the

3    Grand Jury, he is subject to a -- lengthy period of

4    incarceration if he's convicted.  And even though he doesn't

5    have any criminal history, we do have these allegations from a

6    long time ago.  The fact that even if they were delayed

7    reporting, as Mr. Sullivan indicated, that's not uncommon in

8    these kinds of offenses.

9           He has no employment.  He doesn't have any real

10   significant, meaning ties here to this community or to the

11   United States; it's not just the District of New Mexico.

12          But the fact that he left and went to a country that

13   did not have an Extradition Treaty, that plays into my

14   analysis.

15          I do believe that the Government has demonstrated by

16   a preponderance of the evidence that there are no combination

17   of conditions for release that would adequately assure his

18   appearance as required.  So, to my mind, that's the stronger of

19   the arguments.

20          As far as danger to the community, I do believe he is

21   a danger to the community, but that less a factor for me.  I

22   believe the Government has shown that by clear and convincing

23   evidence, given this charge and the evidence that I've received

24   in association with this.  But, primarily, I find him to be a

25   flight risk -- even given his age, even given those medical

1   conditions, I'm cognizant of what Mr. Sullivan said.  He's a

2   very charming man and it does give me concern.

3          So, I'm going to remand him to the custody of the

4   United States Marshal until the time of trial.

5          Now, please -- it gives me no pleasure to send anyone

6   -- and I want everybody to understand that there's an act

7   called The Bail Reform Act, and I'm required to place the

8   Defendant in the least restrictive conditions that I can place

9   someone in.  In this case, I believe the Government has met its

10  burden and that that is my finding.

11         Now, Mr. Perrault, if you disagree with this,

12  Mr. Winder is familiar with this process; you are entitled to a

13  de novo hearing in front of the District Judge in this case.  I

14  believe that's Judge Vazquez.  Is that correct?

15         **MR. SULLIVAN:**  Yes, Your Honor.

16         **THE COURT:**  And that's the route that I would prefer

17  you take at this point rather than asking for reconsideration.

18  I've given it a lot of thought, Mr. Winder.

19         **MR. WINDER:**  Thank you, Your Honor.  And I've

20  discussed this with Mr. Sullivan and Ms. Kastrin, and we will

21  be, most likely, appealing this to Judge Vazquez.  Thank you.

22         **THE COURT:**  And if -- I -- and rather than slow it

23  down by me issuing a written opinion, especially given that

24  it's going to go on a de novo review, I think it's better that

25  I just -- you have my oral findings on the record and those

1   that I'll make in my order of detention, but I'm not going to

2   do an opinion.  All right?

3          **MR. WINDER:**  Thank you, Your Honor.

4          **THE COURT:**  All right.  Thank you, Mr. Perrault.

5   We'll be in recess.

6          **MS. KASTRIN:**  Thank you, Your Honor.  May we be

7   excused?

8          **THE COURT:**  You may.

9       **(This proceeding was adjourned at 12:24 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **September 30, 2018**

          Signed                                            Dated

*TONI HUDSON, TRANSCRIBER*