IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                                  CR No. 17-2558 MV

ARTHUR PERRAULT,

      Defendant.

### UNITED STATES' SENTENCING MEMORANDUM

The United States of America respectfully submits this sentencing memorandum to request that the Court impose a sentence of imprisonment at the high-end of the advisory guideline range or vary upward based on Defendant's deplorable conduct. A sentence of 365 months or more is the only sentence that is just, the only sentence that befits the crime, the only sentence that comports with any moral sense of right and wrong, and the only sentence that will ensure that Defendant does not harm another human life.

### I.  PROCEDURAL HISTORY

Defendant, a serial pedophile who plied his trade for the better part of three decades, was indicted by a federal grand jury on September 21, 2017. The indictment captured only a small fraction of the crimes he actually committed, naming just one of his many victims and, by virtue of the constraints of federal jurisdiction, included only the molestations he inflicted on federal enclaves. Specifically, the indictment charged Defendant in Counts 1 and 2 with aggravated sexual abuse in violation of 18 U.S.C. §§ 7, 2241(c), and 2246(2)(C); in Counts 3 and 6 with aggravated sexual abuse in violation of 18 U.S.C. §§ 7, 2241(c), and 2246(2)(B); in Count 4 with aggravated sexual abuse in violation of 18 U.S.C. §§ 7, 2241(c) and 2246(2)(D); and finally, in

Count 5, with abusive sexual contact in violation of 18 U.S.C. §§ 7, 2244(a)(5) and 2246(3). Doc. 2.

As has been well documented, Defendant, knowing that he would soon be outed as a serial pedophile, fled to Morocco in 1992, a country that has no extradition treaty with the United States. On the strength of the federal indictment, the Moroccan government placed him in custody on October 12, 2017, and later expelled Defendant, transferring his custody to the Federal Bureau of Investigation on or about September 20, 2018. Defendant first appeared before this Court on September 21, 2018. Doc. 10. Defendant was detained after a hearing on September 25, 2018. Doc. 18. Defendant appealed his detention, but his appeal was denied. Doc. 28. He will have been in custody for approximately 23 months at sentencing (from his detention in Morocco on October 12, 2017, to September 13, 2019).

A jury trial was held from April 1 through 10, 2019, and on April 10, 2019, a jury of his peers found Defendant guilty of all seven counts. Doc. 153.

A presentence report (PSR) was prepared and disclosed on July 26, 2019. Doc. 170. Sentencing is presently scheduled for September 13, 2019.

## II.   ARGUMENT

**A.   The Presentence Report Accurately Reflects Defendant's Guideline Range.**

The United States has no objection to the calculations contained in the PSR.[1] The United States Probation Office properly calculates Defendant's total adjusted offense level at 40. PSR at 12, ¶ 82. With a criminal history category of I – one that drastically underrepresents

---

[1] The United States does note that the PSR contains a typographical error in paragraph 108, which should identify M.R., rather than M.H., as the boy for whom Defendant admitted to receiving treatment for molesting. PSR at 17, ¶ 108.

2

Defendant's predation on minors for decades – his guideline imprisonment range is 292 to 365 months (which is the equivalent of approximately 24 to 30 years).  *Id*. at 21, ¶ 132.  This calculation was arrived at using the 1991 guidelines.  *Id*. at 7, ¶ 26.

**B.**     **A Sentence at or Above 365 Months Is Necessary to Satisfy the § 3553 Factors.**

Defendant spent his life raping and molesting children under the guise of being their mentor and spiritual advisor.  No additional descriptors are necessary to illustrate the abhorrent nature of Defendant's actions.  That Defendant repeatedly molested multiple young boys over the course of three decades is a crime of unimaginable magnitude and a betrayal of unspeakable proportions.  The United States could stop right here and take comfort that the point has been made.  Nonetheless, for the reasons stated herein, the United States is opposed to any *downward* departure or variance from the guideline sentencing range and submits that a sentence of at or above 365 months is the only sentence that will accomplish the goals set forth in 18 U.S.C. § 3553.

  1. The Nature and Circumstances of the Offense.

The nature and circumstances of Defendant's offenses are appalling.  While properly calculated, the cold math in the United States Sentencing Guidelines does not and cannot fully represent the egregious nature of Defendant's crimes.  The charges in this case and the resulting guideline range are associated with seven specific acts of sexual abuse of John Doe 1 when he was approximately 10 to 11 years old.  PSR at 4-7, ¶¶ 5-22 (Offense Conduct).  Even if Defendant's crimes were limited to these seven acts, this would support a sentence that kept Defendant incarcerated for the remainder of his life.  The evidence, however, reveals that Defendant's actual abuse of John Doe 1 was much worse – involving predation far in excess of

seven times and a disturbing level of premeditation. In fact, the evidence demonstrates that Defendant sexually abused John Doe 1 repeatedly for nearly two years. At trial, John Doe 1 estimated that Defendant touched him inappropriately approximately 100 times. 4-4-19 Trial Transcript (Uncertified) at 42. This abuse included Defendant digitally penetrating John Doe 1's anus, causing him to bleed on at least once occasion; Defendant performing oral sex on John Doe 1; Defendant groping John Doe 1's penis; and Defendant causing John Doe 1 to touch Defendant's penis. PSR at 5-6, ¶¶ 13-17.

A sentence at or above the high-end of the guideline range is also warranted to reflect Defendant's premeditation. Like a seasoned sexual predator, Defendant ensured that he would be able to continually abuse John Doe 1 undetected by first cultivating a relationship of trust and adoration with John Doe 1 and his family. Indeed, it was no accident that Defendant targeted and groomed John Doe 1 in this way. John Doe 1 and his mother were deeply devout and, therefore, inclined to place a great deal of faith and trust in Defendant because he was a priest. *Id*. at 5, ¶ 10. Exploiting this sacred trust was easy for Defendant because John Doe 1 was present at church on a daily basis and, as an altar boy, Defendant knew he had easy and regular access to his prey. *Id*.

Defendant betrayed this trust and access by systematically grooming John Doe 1. This grooming included trips to restaurants, amusement parks, and gifts. *Id*. at 5, ¶ 11. Moreover, Defendant positioned himself as a mentor and best friend to John Doe 1. *Id*. at 5, ¶ 10. In an act of true depravity, Defendant convinced John Doe 1 that the ongoing molestation was not abuse, it was the opposite – a distinction, a sign that John Doe 1 was special, and something that should be kept secret to avoid jealousy. *Id*. at 5, ¶ 11.

Defendant's repeated sexual abuse of John Doe 1 stopped in approximately October 1992, when John Doe 1 was eleven. While a relief, the abuse did not end because of Defendant's decision to take mercy on this young boy. The abuse ended because of Defendant's cowardice. Defendant learned that other victims of his abuse were coming forward and, to avoid any consequence for his misdeeds, he fled from the United States to Morocco, a country that conveniently had no extradition treaty with the United States. *Id*. at 7, ¶ 22.

Living in Morocco for 26 years, while enjoying a "good environment and lifestyle," *id*. at 16, ¶ 103, Defendant undoubtedly believed that his scheme to avoid justice worked. He was wrong. FBI Agents located Defendant in Morocco and were able to secure his return to the United States on September 21, 2018. *Id*. at 6, ¶ 19. Despite having 26 years to contemplate the magnitude of his breathtaking crimes, Defendant at age 80 proved to be the same cunning and manipulative criminal he was when he fled the United States. During his return trip, Defendant made material misrepresentations to the FBI about his relationship with John Doe 1. 4-5-19 Trial Transcript (Uncertified) at 17-19. While Defendant admitted to historical transgressions with at least one minor, Defendant lied to the FBI by falsely claiming that he could not have abused John Doe 1 on Kirtland Air Force Base (KAFB) or at the Santa Fe National Cemetery (SFNC) in 1991 and 1992 because he ceased all association with KAFB in 1978 and he never performed a funeral at the SFNC. *Id*. The evidence at trial conclusively established that these statements were untrue. *Id*.

Defendant's selective admissions and lies to the FBI were calculated. As discussed in more detail below and in the Sealed Addendum, Defendant knew that he could not credibly deny ever abusing any minor. He also expressly acknowledged that he knew that there were statutes

5

of limitations that prevented criminal charges for older acts of abuse.   4-5-19 Trial Transcript (Uncertified) at 20.   So, Defendant concocted a story that allowed him to admit to the old acts of abuse which were beyond the statute of limitations while simultaneously insulating himself from criminal liability for the charged offenses involving John Doe 1.   This was not coincidence.   It was deliberate and obstructive conduct that further supports a sentence at or above the high-end of the guideline range.

    2.   <u>History and Characteristics of the Defendant</u>

Defendant's placement in Criminal History Category I and his resulting guideline range fail to fully reflect Defendant's history and characteristics, which demonstrate that Defendant is an unrepentant serial predator who has well earned a sentence of at least 365 months, which will be the functional equivalent of a life sentence.

        a.   *Defendant Is a Pedophile Who Preyed Upon and Sexually Abused Minors for Decades*

As painfully recounted at trial, Defendant's abuse of John Doe 1 was not isolated. Rather, as discussed below, the evidence in this case demonstrated that Defendant used his position and authority as a priest and teacher to molest young boys for decades.   Defendant's history of abusing scores of young boys supports a sentence at or above the high-end of the guideline range.

Defendant says he always knew he wanted to be a priest.   PSR at 16, ¶ 101.   While his true motivations to join the clergy are uncertain, his chosen vocation certainly allowed him to indulge his propensity to sexually abuse children.   Defendant positioned himself to be around children not only by entering the clergy, but also by working as a teacher.   Shortly after moving

to New Mexico in the mid-1960s,[2] Defendant became a teacher and faculty advisor at St. Pius High School.  *Id*. at 12, ¶ 83.  It is here that Defendant groomed one of his first victims in New Mexico, John Doe 9, by taking him to the movies and providing him with alcohol and cigarettes.  *Id*.  Eventually, Defendant sexually abused John Doe 9 on numerous occasions by fondling John Doe 9's nipples under John Doe 9's shirt and rubbing Defendant's thigh against John Doe 9's crotch.  *Id*.  In one of Defendant's most brazen acts of abuse, Defendant visited John Doe 9 at his home on a Sunday morning while John Doe 9's parents were present.  *Id*.  Defendant snuck into John Doe 9's room, took off his clothes, and climbed into bed with John Doe 9.  *Id*.  Defendant gratified himself by touching John Doe 9's penis and masturbating John Doe 9 until John Doe 9 ejaculated.  *Id*.

   Defendant continued to abuse young boys in the 1970s.  In 1971, Defendant was made the Parochial Vicar at Our Lady of Guadalupe Church.  Government's Trial Ex. 22 at 2.  It was here that Defendant identified a new pool of young boys to target for abuse, including John Does 3 and 8.  John Doe 3 and his family attended Our Lady of Guadalupe Catholic Church and he was an altar boy there from the late 60s to December 4, 1971.  PSR at 6, ¶ 84.  On December 4, 1971, when John Doe 3 was 13 years old, he was at the church to assist Defendant with a wedding service.  *Id*.  Defendant asked John Doe 3 to follow him to the rectory and ultimately led John Doe 3 to a room with a bed, where Defendant shut the door and locked it.  *Id*.  Defendant proceeded to kiss John Doe 3 on the shoulder, chest, and neck, and touch John Doe 3 over his clothing around his genitals, testicles and penis. *Id*.  Defendant then unzipped John Doe

---

[2] The circumstances of Defendant's arrival in New Mexico, which are relevant to the Court's assessment of Defendant's history and characteristics, are addressed more fully in the Sealed Addendum to this Sentencing Memorandum.

3's pants and placed his hands under John Doe 3's underwear, directly touching his testicles and penis. *Id*. After the encounter in the room ended, John Doe 3 fled from the church, shocked by what had just happened and panicked that Defendant would follow him. *Id*. His fears were founded, as Defendant followed John Doe 3 in a car. *Id*. John Doe 3 escaped Defendant by running into a nearby friend's house and contacting John Doe 3's mother. *Id*. Later that day, John Doe 3's father confronted Defendant, who apologized for what had happened. *Id*. On the same day, Defendant mailed a letter to John Doe 3's mother apologizing for his behavior, blaming it on his reaction to a cancer diagnosis. *Id*. at 7, ¶ 20. That too was a lie. A military record dated 1982 showed that Defendant represented that he never had any type of cancer. Government's Trial Ex. 24. Furthermore, Defendant did not disclose any cancer diagnosis when interviewed by probation. PSR at 18-19. ¶¶ 115-17.

Defendant also used his access to altar boys at Our Lady of Guadalupe Church to abuse John Doe 8. *Id*. at 13, ¶ 86. John Doe 8 was an altar boy and assisted Defendant with mass in the early 1970s. *Id*. From sixth grade through eighth grade, John Doe 8 estimates that Defendant sexually abused him at least 100 times, including oral sex, anal sex, and masturbation. Like with John Doe 1, Defendant groomed John Doe 8 with trips, gifts, and special treatment, such as elevating John Doe 8 to the head altar boy position. *Id*. Also like with John Doe 1, Defendant convinced John Doe 8 that the sexual abuse was something special. The first time Defendant abused John Doe 8 was during a road trip during which Defendant began rubbing John Doe 8's penis over his pants. *Id*. Defendant then pulled over to the side of the road, pulled down John Doe 8's pants, and rubbed John Doe 8's penis until John Doe 8 ejaculated. *Id*. Defendant told John Doe 8 that these acts of abuse were a secret, that God intended them,

and that they made John Doe 8 a man.  *Id*.  In approximately 1992, John Doe 8 approached the Archdiocese of Santa Fe about the abuse perpetrated by Defendant.  *Id*.  On June 5, 1992, John Doe 8 entered into a settlement agreement with Defendant and the Archdiocese.  Notably, this settlement was reached only a few months before Defendant fled to Morocco.

Defendant also worked at Our Lady of the Assumption in the 1970s.  *Id*. at 13-14, ¶¶ 87-88.  It was here that he developed a relationship with John Does 5 and 6 and their parents.  *Id*.  Defendant used this relationship to gain unsupervised access to John Does 5 and 6 and invitations to the family home, where he frequently abused both John Doe 5 and 6 in the living room and bedrooms.  *Id*.  This abuse included Defendant touching the boys' penises over their clothing and attempting to have the boys touch Defendant's penis.  *Id*.  Like with many of his victims, John Doe 5 recalled Defendant telling him that the touching was normal and approved by God.  *Id*.

Defendant's sexual predation on minors continued in the 1980s.  It was during this time frame that he abused John Does 2 and 7.  John Doe 7 met Defendant through another priest.  *Id*. at 13, ¶ 85.  During their very first encounter, Defendant engaged in inappropriate sexual behaviors by masturbating in front of John Doe 7.  *Id*.  After this encounter, John Doe 7 spent time with Defendant at various locations on a monthly basis.  During their visits, Defendant would repeatedly sexually abuse John Doe 7, including by touching John Doe 7's penis and performing oral and anal sex.  *Id*.

John Doe 2 met Defendant through St. Bernadette's church, the same church attended by John Doe 1.  *Id*. at 14, ¶ 89.  Like many of Defendant's other victims, John Doe 2 was an altar server who assisted Defendant with mass.  *Id*.  In approximately 1983 or 1984, Defendant

9

inappropriately touched John Doe 2 on several occasions including while at St. Bernadette's and at Defendant's offsite apartment.   *Id*.

Finally, as recounted earlier in the nature and circumstances of the offense, Defendant's abuse continued into the 1990s with John Doe 1.   *See* discussion *supra* at pp. 3-5.

In summary, for decades, Defendant exploited his position as a priest and teacher to molest dozens of young boys.³   Defendant's guideline range, which is based on seven acts of abuse of a single victim by an individual with no criminal history, does not accurately capture the predator that Defendant is.   In fact, Defendant arguably is eligible for an upward departure based on the underrepresentation of his Criminal History Category.   USSG § 4A1.3; *United States v. Grubbs*, 585 F.3d 793, 804-05 (4th Cir. 2009) ("Here, the district court concluded that a criminal history category of I seriously under-represented Grubbs' criminal history and the likelihood that he would commit future crimes. In so doing, the court specifically noted that Grubbs had at least a twenty-year history of molesting male, middle-school boys, and that he engaged in the "[c]ontinued predatory conduct" of abusing Child Victim 4 after he was under investigation for abuse. On these facts, the district court's decision to upwardly depart was based on the proper criteria set forth in § 4A1.3, and the extent of the departure is reasonable and supported." (internal citation omitted)).   This Court has departed upward on this basis in the past.   *See, e.g., United States v. Medley*, 476 F.3d 835, 836-37 (10th Cir. 2007) (departing upward on the grounds that the defendant's Criminal History Category I "did not sufficiently

---

³ It is worth noting that the uncharged victims identified in the PSR and who testified at trial are not the complete universe of individuals who have alleged that Defendant abused them when they were children.   Rather, the United States is aware of dozens of additional victims who have made similar allegations against Defendant.

10

account for [the defendant's] past criminal conduct").   The above said, an upward departure is not required in this case.   Rather, the court can instead consider the understatement of Defendant's criminal history as one of its reasons for sentencing Defendant to the top of his guideline sentencing range.[4]  *See* USSG § 1B1.4 cmt. background (1991) (noting that "a court is not precluded from considering information that the guidelines do not take into account" and that such information could "provide a reason for a sentence at the top of the guideline range").

For the reasons set forth above, the United States submits that Defendant's history and characteristics support a sentence at or above 365 months imprisonment.

### b. *Defendant Fled From His Accusers*

Shortly after reaching a settlement with John Doe 8, and when Defendant's horrific crimes were on the cusp of being exposed to the public, Defendant cowardly fled to Canada to be beyond the reach of the New Mexico and United States governments.   PSR at 7, 13, 15, ¶¶ 22, 86, 99.   After a short period of time, he chose Morocco to spend his life, where there is no extradition treaty with the United States.   There, from 1993-2017, he taught at the American Language Center, surrounded by students, including minors.

While many of his victims in the United States struggled daily to make sense of the horrors Defendant inflicted upon them as children, Defendant enjoyed his freedom in Morocco.   He was able to grow old without consequence, while his victims grew up burdened not only by the trauma they had endured but also by the anguish that Defendant had successfully

---

[4] If Defendant had been classified instead as a Criminal History Category III, for example, his advisory guideline range would have been 360 months to life.   A high-end sentence of 365 months approximates the low-end guideline sentence at this increased Criminal History Category.

avoided any reckoning for his egregious violations. Being free further gave him the opportunity to prey upon any number of other unknown victims.[5] While old age in some cases may justify leniency at sentencing, this case is not one of them. Rather, Defendant's advanced age is an aggravating factor here, symbolizing his successful evasion of justice and the years of additional suffering felt by his victims who longed for Defendant to be brought to justice. Each day that Defendant avoided being held to account for his crimes was a day that he was mocking the justice system and, by extension, the children who trusted and believed in him and have subsequently carried their trauma into adulthood. It is for these reasons that Defendant's sentence should ensure that he remains in prison for the rest of his life. *See United States v. Bartoli*, 728 F. App'x 424, 430 (6th Cir. 2018) (affirming upward variance based in part on the fact that the defendant fled to Peru to avoid arrest and noting that the defendant's age was not grounds for leniency because his "age at sentencing was due in part to the thirteen years he spent on the run"). If Defendant had not fled the United States and instead had been convicted near the time of the offense, in the early 1990s, when he was in his early 50s, then perhaps Defendant could have credibly argued for a sentence that left the chance for some "daylight" at the end of the sentence, where Defendant might have spent some years out of prison after service of his sentence. But here, Defendant took an advance on that "daylight" when he fled to Morocco and lived freely for over two decades. Defendant should not now get the benefit of his flight for a second time by cashing in on his age. *See United States v. Irey*, 612 F.3d 1160, 1205-06 (11th

---

[5] The fact that no allegations have been made against Defendant in Morocco, s*ee* PSR at 16, ¶ 103, does not necessarily mean that no abuse occurred. As demonstrated by Defendant's history and characteristics, Defendant was able to successfully abuse minors in New Mexico for decades without any allegations of misconduct being made.

Cir. 2010) ("[I]f [the defendant] had not successfully evaded detection for four or five years he would be that much younger when he gets out of prison. In these circumstances rewarding [the defendant] for being older rewards him for evading detection and it is unreasonable to do that.")

3. <u>The Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant</u>

The only just punishment in this case is a sentence that guarantees that Defendant remain in custody for the rest of his life. The impact of Defendant's crimes did not end when he fled from the United States. Rather, Defendant's egregious conduct will have a lifelong effect on the victims. Dr. Gail Goodman testified about some of these negative effects during the trial, including depression, anxiety, hyper-vigilance, and aggression. 4-4-19 Trial Transcript (Uncertified) at 149-51. Her testimony is supported by studies that have consistently shown that childhood sexual abuse may profoundly impact a child's development, increasing the risk for additional consequences. *See, e.g.*, Victoria L. Banyard et al., *The long-term mental health consequences of child sexual abuse: An exploratory study of the impact of multiple traumas in a sample of women*, 14 Journal of Traumatic Stress 697, 697 (2001) ("[c]hild sexual abuse victims reported a lifetime history of more exposure to various traumas and higher levels of mental health symptoms"); Annmarie McDonagh-Coyle et al., *Psychophysiological reactivity in female sexual abuse survivors*, 14 Journal of Traumatic Stress 667, 681 (2001) (victims experience physiological reactions associated with reminders of the abuse and trauma).

These negative effects are not speculative. Rather, many of the victims testified about how Defendant's abuse has reverberated throughout their lives, adversely impacting their faith, self-worth, and ability to hold steady jobs or have meaningful social, familial, and romantic

13

relationships. *See, e.g.,* 4-4-19 Trial Transcript (Uncertified) at 43 (testimony of John Doe 7 that Defendant's abuse "affects me every single day. It has affected my life. It's affected my marriage. It's affected my relationship with God, question my identity, question my faith."); *see also* Ex. A to United States' Sealed Addendum (Victim Impact Statement from John Doe 2). His abuse caused some victims to become suicidal or engage in substance abuse. *See* 4-2-19 Trial Transcript (Uncertified) at 129 (testimony of John Doe 8 that Defendant's abuse "ruined my life . . . I'm embarrassed to say that I wish to God that – that he would have taken my life."); *id*. at 155 (testimony of John Doe 9 that Defendant's abuse has had "widespread detrimental effects" to his life including drug abuse and alcohol abuse). Several victims blame themselves for Defendant's heinous acts, including John Doe 7 who testified that he believed he was going to go to hell because of them. 4-3-19 Trial Transcript (Uncertified) at 39-40. Defendant stole the innocence, faith and trust of so many. No person should suffer in the way that Defendant's victims have suffered, especially not at the hands of their priest. Justice in this case is a sentence at or above 365 months.

A substantial sentence is also necessary to promote respect for the law, provide adequate deterrence, and protect the public from further crimes by Defendant. Defendant is unrepentant. To this day, Defendant has not accepted responsibility for his abuse of John Doe 1 and nearly every other uncharged victim. As a result of this, John Doe 1 (and the additional victims described above) had to endure the trauma of publicly recounting the worst moments of their lives during the trial. Defendant's failure to appreciate the wrongfulness of his abuse makes him more likely to repeat it if given the opportunity. A number of courts, including the Tenth Circuit, have recognized that defendants who lack insight into the criminality of their actions

14

present an increased danger to the community.  *See United States v. Dotson*, 574 F. App'x 821, 827 (10th Cir. 2014) (affirming district court's upward variance as substantively reasonable where court relied, in part, on the defendant's lack of remorse, which translated into an increased risk of recidivism); *United States v. Santiago-Colon*, 918 F.3d 223, 227 (1st Cir. 2019) (affirming 40-year sentence for pastor who sexually abused minors and noting that the defendant "throughout maintained he was innocent of the charges – hardly an indication of intent to rehabilitate"); *United States v. Christy*, 2010 WL 2977610, at *8 (D.N.M. June 28, 2010) ("The Court believes that [the defendant's] inability to fully recognize his wrongdoing makes him an ongoing danger to the community, especially children.  His refusal to recognize the severity of his conduct suggests [the defendant] may be more likely than others to repeat such behavior in the future.").  To the extent Defendant claims that his advanced age reduces the risk of recidivism, the United States disagrees.  In *United States v. Irey*, the Eleventh Circuit analyzed this argument and concluded that "[s]tudies and reports in this field are consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat."  612 F.3d 1160, 1214 (11th Cir. 2010).  In reaching this determination, the court noted a number of cases involving defendants who committed child sex abuse crimes at an advanced age, and the conclusions of Congress and the Supreme Court that pedophiles have an extremely high rate of recidivism.  *Id*.  For this reason, Defendant's sentence should guarantee that he will never again be in a position where he has access to minors.  A sentence at or above 365 months will accomplish this.

    4. <u>The Need to Avoid Unwarranted Sentencing Disparities Between Defendants Who Have Committed Similar Crimes</u>

Defendant's criminality was uniquely horrific.  It is difficult to identify a similar case,

involving a defendant who occupied a similar position of trust and authority; who abused as many minors, as frequently, and for as many decades; and who fled from justice and failed to repent and plead guilty to the misconduct.  In *United States v. Santiago-Colon*, the district court imposed a within-guideline,[6] forty-year sentence on the defendant, a pastor, who was convicted after trial of three counts of transporting a minor with intent to engage in criminal sexual activity. 918 F.3d 223, 224 (1st Cir. 2019). The facts of the case demonstrated that, "[b]etween 2004 and 2011, Santiago-Colon sexually abused at least five young boys between the ages of twelve and sixteen, including over twenty incidents with one victim." *Id*.  Like Defendant, Santiago-Colon "met the victims and their families through church" and exploited the trust of these families to obtain permission to spend unsupervised time with the boys, during which he would sexually abuse them.  *Id*. at 224-25.  Like Defendant, Santiago-Colon "was able to continue his predations because he instructed the victims not to tell anyone about the sexual abuse." *Id* at 225.  While Defendant's and Santiago-Colon's cases have a number of striking similarities, and both defendants' conduct is deplorable, the United States submits that Defendant's offenses are worse.  Defendant abused more children, for more years, and with greater frequency. For this reason, a sentence at or above 365 months will not create any unwarranted sentencing disparities.

---

[6] Santiago-Colon's guideline range exceeds that of Defendant's because Santiago-Colon received a five-level enhancement "because the defendant engaged in a pattern of activity involving prohibited sexual conduct" under USSG § 4B1.5(b)(1).  *Santiago-Colon*, 918 F.3d at 225.  This enhancement did not exist under the 1991 guidelines applicable to Defendant.

### III. **CONCLUSION**

By any measure and in any civilized society, Defendant's acts are on the short list of the most heinous and despicable crimes committed by man. Nothing in the United States Sentencing Guidelines or § 3553 mitigates that stark fact. To the contrary, the Sentencing Guidelines appropriately pin the advisory guideline range well beyond Defendant's expected natural life, and application of the § 3553 factors does nothing more than reinforce that a de facto life sentence is an appropriate and just sentence. Accordingly, the United States respectfully requests that this Court conclude that a sentence at or above 365 months is the just sentence.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

*Electronically filed*
HOLLAND S. KASTRIN
SEAN SULLIVAN
Assistant United States Attorneys
PO Box 607
Albuquerque, NM 87103
(505) 346-7274

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system which will send
notification to opposing counsel of record.

   *Filed Electronically*
HOLLAND S. KASTRIN
Assistant United States Attorney